# EXHIBIT A

Law Division Motion Section Initial Case Management Dates for CALENDARS (A, B, C, D, F, H, R, X, Z) will be heard In Person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 10/11/2023 10:00 AM

FILED
8/2/2023 7:29 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L007714
Calendar, A
23805459

Civil Action Cover Sheet – Case Initiation                                        (12/01/20) CCL 0520

#02329  BRP\cb  8/2/20232021N-2002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

ERIC KLASS;
and
ELIZABETH KLASS,

       Plaintiffs,

    v.

3M COMPANY;
AGC CHEMICALS AMERICAS, INC.;
AMEREX CORPORATION;
ARCHROMA U.S., INC;
ARKEMA, INC.;
BUCKEYE FIRE EQUIPMENT;
CARRIER GLOBAL CORPORATION;
CHEMGUARD, INC.;
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS & CO.;
FIRE-DEX, LLC;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC.;
LION GROUP, INC.;
MINE SAFETY APPLIANCE COMPANY LLC;
NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS, INC.;
PERIMETER SOLUTIONS, LP;
STEDFAST USA, INC.;
TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN
MILLS INC.;
THE CHEMOURS COMPANY L.L.C.;
TYCO FIRE PRODUCTS, L.P.;
and
W.L. GORE & ASSOCIATES, INC.,

       Defendants and,

AIR ONE EQUIPMENT, INC., an Illinois corporation,

       Respondent in Discovery.

2023L007714

No. _____

### CIVIL ACTION COVER SHEET – CASE INITIATION

A Civil Action Cover Sheet – Case Initiation shall be filed with the
complaint in all civil actions. The information contained herein
is for administrative purposes only and cannot be introduced into
evidence.  Please check the box in front of the appropriate case
type which best characterizes your action. Only one (1) case type
may be checked with this cover sheet.

Jury Demand  ☒Yes  ☐No

**PERSONAL INJURY/WRONGFUL DEATH**
CASE TYPES:
  ☐ 027 Motor Vehicle
  ☐ 040 Medical Malpractice
  ☐ 047 Asbestos
  ☐ 048 Dram Shop

(FILE STAMP)

**COMMERCIAL LITIGATION**
CASE TYPES:
  ☐ 002 Breach of Contract
  ☐ 070 Professional Malpractice

FILED DATE: 8/2/2023 7:29 PM   2023L007714

FILED DATE: 8/2/2023 7:29 PM    2023L007714

☑ 049 Product Liability (other than asbestos or medical)
☐ 051 Construction Injuries
　　　(including Structural Work Act, Road
　　　Construction Injuries Act and negligence)
☐ 052 Railroad/FELA
☐ 053 Pediatric Lead Exposure
☐ 061 Other Personal Injury/Wrongful Death
☐ 063 Intentional Tort
☐ 064 Miscellaneous Statutory Action
　　　*(Please Specify Below**)*
☐ 065 Premises Liability
☐ 078 Fen-phen/Redux Litigation
☐ 199 Silicone Implant

**TAX & MISCELLANEOUS REMEDIES**
CASE TYPES:
☐ 007 Confession of Judgment
☐ 008 Replevin
☐ 009 Tax
☐ 015 Condemnation
☐ 017 Detinue
☐ 029 Unemployment Compensation
☐ 031 Foreign Transcript
☐ 036 Administrative Review Action
☐ 085 Petition to Register Foreign Judgment
☐ 099 All Other Extraordinary Remedies

☐ 071 Fraud (other than legal or medical)
☐ 072 Consumer Fraud
☐ 073 Breach of Warranty
☐ 074 Statutory Action
　　　*(Please Signify Below**)*
☐ 075 Other Commercial Litigation
　　　*(Please Signify Below***)*
☐ 076 Retaliatory Discharge

**OTHER ACTIONS**
CASE TYPES:
☐ 062 Property Damage
☐ 066 Legal Malpractice
☐ 077 Libel/Slander
☐ 079 Petition for Qualified Orders
☐ 084 Petition to Issue Subpoena
☐ 100 Petition for Discovery

** _____
_____

Primary Email: __ccfiling@corboydemetrio.com___

Secondary Email: __brp@corboydemetrio.com____

Tertiary Email: ____cbrowne@corboydemetrio.com___

By: _____
　　(Attorney)　　　　　　　　(Pro Se)

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice from the Clerk's Office for this case at this email address: _____

**IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

FILED DATE: 8/2/2023 7:29 PM   2023L007714

# 02329    BRP\cb    7/11/2023              2021N-2002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

ERIC KLASS;
and
ELIZABETH KLASS,

              Plaintiffs,

              v.

3M COMPANY;
AGC CHEMICALS AMERICAS, INC.;
AMEREX CORPORATION;
ARCHROMA U.S., INC;
ARKEMA, INC.;
BUCKEYE FIRE EQUIPMENT;
CARRIER GLOBAL CORPORATION;
CHEMGUARD, INC.;
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS & CO.;
FIRE-DEX, LLC;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC.;
LION GROUP, INC.;
MINE SAFETY APPLIANCE COMPANY LLC;
NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS, INC.;
PERIMETER SOLUTIONS, LP;
STEDFAST USA, INC.;
TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN
MILLS INC.;
THE CHEMOURS COMPANY L.L.C.;
TYCO FIRE PRODUCTS, L.P.;
and
W.L. GORE & ASSOCIATES, INC.,

              Defendants,

AIR ONE EQUIPMENT, INC., an Illinois corporation,

              Respondent in Discovery.

2023L007714

No.

**PLAINTIFFS DEMAND TRIAL BY JURY**

FILED DATE: 8/2/2023 7:29 PM    2023L007714

## COMPLAINT AT LAW

Plaintiffs, ERIC KLASS and ELIZABETH KLASS, by and through their attorneys, CORBOY & DEMETRIO, P.C., complaining of defendants, 3M COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC; ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT; CARRIER GLOBAL CORPORATION; CHEMGUARD, INC.; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & CO.; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; LION GROUP, INC.; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA, d/b/a SOUTHERN MILLS INC.; THE CHEMOURS COMPANY L.L.C.; TYCO FIRE PRODUCTS, L.P.; and W.L. GORE & ASSOCIATES, INC., and each of them, state:

## **INTRODUCTION**

1.    Plaintiff, ERIC KLASS was a firefighter who has served the City of Naperville and the Village of Westmont as a firefighter. Plaintiff, ELIZABETH KLASS, is ERIC KLASS' spouse.

2.    Plaintiff brings this action for monetary damages for harm resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in products manufactured, designed, sold, supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

3.    PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water.

2

PFAS include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short chain" PFAS made up of six or fewer carbon atoms ("short chain PFAS").

4.     PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain.  PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.

5.     PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

6.     Unbeknownst to ERIC KLASS, Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts") and in Class B firefighting foam ("Class B foam").  Class B foams are synthetic "soap-like" foams that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors.  The most common Class B foam is aqueous film-forming foam (or "AFFF").

7.     For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health.  Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock, as well as PFAS-containing turnouts and Class B foam, to firefighting training facilities and fire departments nationally, including in Illinois and specifically in the Naperville Fire Department and Westmont Fire Department.  Defendants did so, moreover, without ever informing firefighters or the public that turnouts and Class B foams contained PFAS and without warning firefighters or the public of

3

FILED DATE: 8/2/2023 7:29 PM    2023L007714

the substantial and serious health risks and injuries that can result from exposure to PFAS or PFAS-containing materials.

8.    ERIC KLASS wore turnouts and used and/or was exposed to Class B foam in the usual and normal course of performing his firefighting duties in Dupage and Will County, Illinois, and was repeatedly exposed to PFAS in his workplace for decades.

9.    At all relevant times and continuing to the present, Defendants have represented that their turnouts and Class B foam are safe.

10.    ERIC KLASS discovered a connection between these products and his cancer less than two years before the filing of this Complaint.

11    ERIC KLASS used the turnouts and Class B foam as they were intended and in a foreseeable manner which exposed him to PFAS in the course of his firefighting activities.  This repeated and extensive exposure to PFAS results in prostate cancer.  This PFAS exposure continues to pose a significant threat to his personal health due to PFAS's persistence, pervasiveness, toxicity and bioaccumulation.

12.    Defendants knowingly and willfully manufactured, designed, marketed, sold and distributed chemicals and/or products containing PFAS for use within the State of Illinois when they knew or reasonably should have known that ERIC KLASS would repeatedly inhale, ingest and/or have dermal contact with these harmful compounds during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

13.    Plaintiffs bring this action against Defendants and seek money damages.

## PARTIES TO THE ACTION

**A.    Plaintiff Eric Klass**

4

14.     ERIC KLASS was a firefighter for 7 years for the City of Naperville Fire Department and 7 years for the Westmont Fire Department. His firefighter training included building construction, fire appliances, pump operations, ladders, search and rescue, ventilation, utility control, salvage and overhaul, vehicle extrication, incident command, and basic first aid.  In the course of firefighting training and fire suppression activities, ERIC KLASS routinely wore turnouts and has used and/or been exposed to Class B foam.

**B.     Plaintiff Elizabeth Klass**

15.     ELIZABETH KLASS is the spouse of ERIC KLASS.  ELIZABETH KLASS and ERIC KLASS were lawfully married at all times relevant to this action and are currently husband and wife.

**C.     Defendants**

16.     Defendant 3M COMPANY (a/k/a Minnesota Mining and Manufacturing Company) is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  3M has its principal place of business in St. Paul, Minnesota.  3M developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

17.     Defendant AGC CHEMICALS AMERICAS, INC., ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  AGC has its principal place of business in Exton, Pennsylvania.  AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

18.     Defendant AMEREX CORPORATION, also known as Alabama Amerex Corporation, ("Amerex") is an Alabama corporation that does business throughout the United

5

FILED DATE: 8/2/2023 7:29 PM     2023L007714

States, including conducting business in Illinois. Amerex has its principal place of business in Trussville, Alabama. Amerex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including Illinois.

19.    Defendant ARCHROMA U.S., INC., ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in Illinois. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

20.    Defendant ARKEMA, INC., ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Illinois. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

21.    Defendant, BUCKEYE FIRE EQUIPMENT ("Buckeye") is a North Carolina corporation that does business throughout the United States, including conducting business in Illinois. Buckeye has its principal place of business in Kings Mountain, North Carolina. Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B Foams, including Illinois.

22.    Defendant CARRIER GLOBAL CORPORATION ("Carrier") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois. Carrier has its principal place of business in Palm Beach Gardens, Florida. Carrier

FILED DATE: 8/2/2023 7:29 PM     2023L007714

FILED DATE: 8/2/2023 7:29 PM    2023L007714

developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials and products containing PFAS in turnouts and/or Class B foams, including Illinois.

23.    Defendant CHEMGUARD, INC., ("Chemguard") is a Wisconsin corporation that does business throughout the United States, including conducting business in Illinois.  Chemguard has its principal place of business in Marinette, Wisconsin.  Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

24.    Defendant, DYNAX CORPORATION, ("Dynax") is a New York corporation that does business throughout the United States, including conducting business in Illinois.  Dynax has its principal place of business in Pound Ridge, New York.  Dynax developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

25.    Defendant, E.I. DU PONT DE NEMOURS & CO., ("DuPont") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  DuPont has its principal place of business in Wilmington, Delaware.  DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

26.    Defendant, FIRE-DEX, LLC, ("Fire-Dex") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  Fire-Dex has its principal place of business in Medina, Ohio.  Fire-Dex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

FILED DATE: 8/2/2023 7:29 PM    2023L007714

27.    Defendant, FIRE SERVICE PLUS, INC., ("Fire Service Plus") is a Georgia corporation that does business throughout the United States, including conducting business in Illinois.  Fire Service Plus has its principal place of business in Simi Valley, California.  Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

28.    Defendant, GLOBE MANUFACTURING COMPANY, LLC, ("Globe") is a New Hampshire corporation that does business throughout the United States, including conducting business in Illinois.  Globe has its principal place of business in Pittsfield, New Hampshire.  Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois. Defendant Mine Safety Appliance Company acquired Globe Holding Company, LLC and its subsidiaries (collectively "MSA/Globe") in 2017 and continues to do business under the Globe name.

29.    Defendant, HONEYWELL SAFETY PRODUCTS USA, INC., ("Honeywell") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  Honeywell has its principal place of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

30.    Defendant, JOHNSON CONTROLS, INC., ("Johnson Controls") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  Johnson Controls has its principal place of business in Milwaukee, Wisconsin.  Johnson

FILED DATE: 8/2/2023 7:29 PM    2023L007714

Controls is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc., Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

31.    Defendant, LION GROUP, INC., ("Lion") is a Ohio corporation that does business throughout the United States, including conducting business in Illinois.  Lion has its principal place of business in Dayton, Ohio.  Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

32.    Defendant, MINE SAFETY APPLIANCE COMPANY, LLC, ("MSA/Globe") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Illinois.  MSA has its principal place of business in Cranberry Township, Pennsylvania.  MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively "MSA/Globe") in 2017 and continues to do business under the Globe name.  MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

33.    Defendant, NATIONAL FOAM, INC., ("National Foam") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Illinois.  National Foam has its principal place of business in West Chester, Pennsylvania.  National Foam developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

34.    Defendant, PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  PBI has its principal place of business in Charlotte, North Carolina.  PBI developed, manufactured, marketed,

9

distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

35.     Defendant, PERIMETER SOLUTIONS, LP, ("Perimeter Solutions") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  Perimeter Solutions has its principal place of business in Rancho Cucamonga, California. Perimeter Solutions developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

36.     Defendant, STEDFAST USA, INC., ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  StedFast has its principal place of business in Piney Flats, Tennessee.  StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS,  PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

37.     Defendant, TENCATE PROTECTIVE FABRICS USA, d/b/a SOUTHERN MILLS, INC.  ("TenCate") is a Georgia corporation that does business throughout the United States, including conducting business in Illinois.  TenCate has its principal place of business in Senoia, Georgia.  TenCate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

38.     Defendant, THE CHEMOURS COMPANY, L.L.C., ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois.  Chemours has its principal place of business in Wilmington, Delaware.  Chemours

FILED DATE: 8/2/2023 7:29 PM     2023L007714

FILED DATE: 8/2/2023 7:29 PM    2023L007714

developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

39. Defendant, TYCO FIRE PRODUCTS, L.P., ("Tyco") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois. Tyco has its principal place of business in Exeter, New Hampshire. Tyco developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

40. Defendant, W. L. GORE & ASSOCIATES, INC., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in Illinois. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in Illinois.

41. Plaintiff alleges that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused the injuries to Plaintiffs, as alleged herein.

42. Plaintiff alleges that each named Defendant derived substantial revenue from the PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams that Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled and/or sold within Illinois and that were used by ERIC KLASS herein within Illinois.

43. Defendants expected or should have expected their acts to have consequences within the State of Illinois and derived substantial revenue from interstate commerce.

44. Defendants purposefully availed themselves of the privilege of conducting activities within the State of Illinois, thus invoking the benefits and protections of its laws.

11

FILED DATE: 8/2/2023 7:29 PM    2023L007714

## SUBSTANTIVE ALLEGATIONS

**A.    The Plaintiff's Use of and Exposure to PFAS-Containing Products**

45.    ERIC KLASS serves the City of Naperville as a firefighter and worked in various fire stations, engineer, truck and/or specialized companies throughout the City of Naperville from 2016 to the present.

46.    As a first responder to fire, medical and other emergency calls, ERIC KLASS risked his life on a daily basis.  His mission was to not only save lives and homes, but also to provide emergency services and medical care, perform rescues, and offer support to people in traumatic circumstances.  To prepare for this enormously challenging work, ERIC KLASS wore turnouts and received training in fire suppression (including the preparation, handling and use of firefighting foam), fire prevention, rescue, and emergency medical care techniques to protect and/or minimize the loss of life, property, and damage to the environment.

47.    For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed chemical feedstock and/or turnouts and/or Class B foam containing PFAS to firefighting training facilities and fire departments globally, including within the State of Illinois and the City of Naperville.

48.    With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia,* resist and repel oil, heat and water, and have been found to have negative health effects.  These toxic chemicals are present in firefighter turnouts and Class B foam.

**(1)    PFAS-Containing Turnout Gear**

12

49.     During firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter.  Turnout gear components include individual components such as a helmet, hood, jacket, pants and suspenders, boots, and gloves.  Each component of the jacket and pants are made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

50.     PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to the outer shell and moisture barrier of turnout gear.

51.     A study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including ERIC KLASS.

52.     When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation.  Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' personal vehicles and homes.

53.     Unbeknownst to firefighters, such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980 internal memo, DuPont officials described measures that were needed to prevent workplace exposure to

13

FILED DATE: 8/2/2023 7:29 PM    2023L007714

PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

54.    Plaintiff ERIC KLASS wore turnouts in the ordinary course of performing his duties as the turnouts were intended to be used and in a foreseeable manner which exposed him to significant levels of PFAS.

55.    Plaintiff ERIC KLASS did not know, and in the exercise of reasonable diligence could not have known, that the turnouts he wore or used in the course of performing his duties contained PFAS or PFAS-continuing materials, and similarly did not know and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts he wore or used in performing his duties. The turnout gear worn or used by ERIC KLASS did not and does not contain labeling information warning that the gear contains PFAS, and similarly did not and does not warn ERIC KLASS of the health risks associated with exposure to PFAS.

**(2)    PFAS-Containing Class B Foam**

56.    Class B foam is one of the primary tools used by firefighters for suppression of fires and is particularly effective for extinguishing fires involving oil and/or chemicals common at transportation accidents, aircraft accidents, and chemical spills. Class B foam is also used in structural or other types of non-chemical fires when water cannot penetrate deeply enough to ensure that unseen fire is extinguished. The most common Class B foam is aqueous film-forming foam ("AFFF"). AFFF and other Class B foam contain PFAS.

57.    To use Class B foam, a Class B foam concentrate must first be mixed with water.

58.    Class B foam concentrate is typically sold in five-gallon containers that firefighters are responsible for storing on the fire engine and/or pouring into the foam bladder of a fire engine. To mix the foam concentrate and water from a fire engine that is not pre-plumbed for foam, an educator must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, foamy substance. Firefighters are responsible for this process of preparing the foam, applying the foam and for cleaning the equipment (hoses, nozzles, etc.) after use.

59.    The process of preparing Class B foam, applying the foam, and then cleaning the equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact). The Class B foam containers used by ERIC KLASS and his fire department to mix and prepare the Class B foam for use did not say that the foam contains PFAS, and did not warn ERIC KLASS of the serious health risks associated with exposure to PFAS

60.    Class B foam is used in fire extinguishment by spraying it through a fire hose, appliance or nozzle.

61.    The techniques used for "laying a blanket" of Class B foam in fire extinguishment include: banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structure fires, it can also be necessary to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam blanket will break down over a short time.

62.    These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or even soaked with Class B foam, walking in and through Class B foam (which can reach thigh- or even waist-high), or kneeling in Class B foam during use. As a result, the exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).

15

FILED DATE: 8/2/2023 7:29 PM    2023L007714

63.    Plaintiff ERIC KLASS used and/or was exposed to Class B foam in the ordinary course of performing his duties as it was intended to be used and in a foreseeable manner which exposed him to PFAS.

64.    Plaintiff ERIC KLASS did not know, and in the exercise of reasonable diligence, could not have known that the Class B foam he used and/or was exposed to in the course of performing his duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the Class B foam he used and/or was exposed to in performing his duties.

**B.    The Chemical Structure of PFAS Makes Them Harmful To Human Health**

65.    PFAS are known as "forever chemicals" because they are immune to degradation, bio-accumulate in individual organisms and humans, and increase in concentration up the food chain.  Indeed, scientists are unable to estimate an environmental half-life (i.e. the time it takes for 50% of the chemical to disappear) for PFAS.  Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.

66.    PFAS are nearly indestructible and are highly transportable.  PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.

67,    PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research conducted in 2020 shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity

FILED DATE: 8/2/2023 7:29 PM    2023L007714

as long-chain PFAS. Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.

68.     In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX", finding that two of Defendant Chemours GenX chemicals are more toxic than PFOA - the highly toxic chemical these were intended to replace.

69.     To date, there is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS, is an attempt to obscure the fact that there are thousands of PFAS - including precursor PFAS which degrade into PFOA and PFOS - just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.

70.     PFAS exposure effects nearly every system in the human body. It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.

**C.     Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied and/or Sold Toxic PFAS and/or Products Containing PFAS**

17

71.     Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in products, including in PFAS containing turnout gear and Class B foam, throughout the United States and in Illinois.

72.     PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

73.     By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

74.     In the 1960s, Class B foam containing PFAS entered the global market and became the primary firefighting foam all over the world with 3M as one of the largest manufacturers.

75.     In the 1970s, Defendants National Foam and Tyco began to manufacture, market and sell Class B foam containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s, and Defendant Buckeye in the 2000s.

76.     Founded in 1918, Defendant MSA/Globe began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.

77.     Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.

18

78.     Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants DuPont, Gore, PBI, and StedFast.

**D.      Defendants Knew Exposure to PFAS Causes Serious Health Impacts**

79.     Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed within the companies internally, yet were never made public or shared with any regulatory agencies.

80.     Approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bioaccumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS.  These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.

81.     In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the EPA information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, the Naperville Fire Department, the Westmont Fire Department, the Plaintiffs, or the public about the health impacts resulting from exposure to PFAS.  Indeed, in at least some instances,

19

Defendants' own attorneys advised the companies to conceal their damaging findings on PFAS, which they did for decades.

82.     In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, as well as Class B foam, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term.

83.     However, 3M did not recall PFOS, its chemical feedstock, or any Class B foam that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country.  And, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing turnouts, and Class B foams and did so without any warning to firefighters or to the public concerning the fact that these turnouts and foams contained PFAS, or that they posed a serious health risk to human health.  Defendants instead continued to claim their products were safe.

84.     By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

85.     In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

FILED DATE: 8/2/2023 7:29 PM    2023L007714

86.    Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including turnouts and Class B foam, and continued to publicly claim that these products were safe.  Defendants affirmatively suppressed independent research on PFAS, and instead commissioned dubious research and white papers to support their claims that PFAS and PFAS-containing products were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

87.    As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, the plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA."

88.    Class B foam manufacturers and distributors adopted a similarly aggressive industry campaign to evade government oversight or public attention of the risks posed by their products.  At a March 2001 meeting of the National Fire Protection Association's Technical Meeting on Foam, which included Defendant Class B foam manufacturers Tyco, Chemguard and National Foam, a 3M representative informed attendees that 3M had discontinued its Class B foam business, citing concerns about the "proven pervasiveness, persistence and toxicity" of PFOS. Attendees also were informed of evidence that telomer-based fluorosurfactants (used by every Class B foam manufacture except 3M) degrade to PFOA and, worse, exhibit an even greater degree of pervasiveness and toxicity than PFOA.

89.    On or about the same time, certain Defendants, including at least Tyco, DuPont, Dynax and Buckeye, founded and/or became members of the Fire Fighting Foam Coalition ("FFFC") – a non-profit organization of manufacturers, distributors and suppliers of Class B foam (specifically AFFF).  The FFFC's self-described role was to be "the environmental voice for users

21

and manufacturers of AFFF – one designed to ignore the health impacts of exposure to PFAS-containing Class B foams such as AFFF.

90.     Defendants continued to produce Class B foams containing PFAS and continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

91.     In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company).   In the face of and undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, distribute and/or sell turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).

92.     In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, and Arkema to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.

93.     By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and that at least one of them produces the same types of cancerous tumors in rats as had been found in long-chain PFAS studies.

94.     In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described in paragraph, above, began releasing its findings.   The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination

FILED DATE: 8/2/2023 7:29 PM   2023L007714

area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

95.    In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable.  As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."

96.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services, released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."

97.    In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS.   Roberts remarked that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity - as testified to by one of DuPont's former scientists only

23

a few days earlier.   Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.

### E.  Defendants Failed to Warn Plaintiffs of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe

98.     As alleged above, Defendants knew that PFAS are persistent, toxic, and bioaccumulating with a very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

99.     Yet, Defendants **did not warn** Plaintiffs that PFAS and Defendants' PFAS containing products, including turnouts and Class B foams used by the Firefighter Plaintiffs, contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

100.     Instead, Defendants falsely represented—and continue to falsely represent— that PFAS and PFAS-containing products, including turnouts and Class B foams, are safe and not harmful to humans or the environment.

101.     Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products.  For example, Congress passed legislation to address PFAS in turnouts and foam, and numerous states have severely restricted and/or banned PFAS-containing firefighting foam. For example, California will also require sellers of turnout gear to notify purchasers if it contains PFAS while Colorado has banned PFAS-containing turnouts as of 2022. The U.S. Food and Drug Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH).  And private companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products containing any

FILED DATE: 8/2/2023 7:29 PM     2023L007714

PFAS, as have several outdoor, durable clothing companies (e.g. Columbia and Marmot), clothing retailers (e.g. H&M, Levi Strauss & Co), shoe companies (e.g. Adidas and New Balance), car seat manufacturers (e.g. Britax and Graco), furniture companies (e.g. IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.

(1)     **Defendants Provide No Safety Warnings on Product Labels**

102.     Plaintiffs allege that the packaging on the PFAS-containing Class B foam containers used for mixing Class B foam with water, pumping the mixture into engines, and for spraying and laying foam blankets for fire suppression or fire suppression training, contained no warning that the Class B foam contained PFAS. Nor did it inform persons handling or using the foam as it was intended to be handled that such use can result in exposure to PFAS and serious bodily harm.

103.     Plaintiffs further allege that turnouts containing PFAS or PFAS materials sold by Defendants in Illinois, and used by Plaintiff, ERIC KLASS, in training, emergency incidents, or in fire suppression during his firefighting career, also contained no warning that the turnouts contain PFAS or PFAS materials.  Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

(2)     **Defendants' MSDS Sheets Do Not Warn About PFAS or PFAS Exposure**

104.     A Material Safety Data Sheet (or "MSDS") is a document that Occupational Safety and Health Administration (OSHA) requires companies to provide to end users for products that contain substances or chemicals that are classified as hazardous or dangerous. Access to such

FILED DATE: 8/2/2023 7:29 PM   2023L007714

FILED DATE: 8/2/2023 7:29 PM    2023L007714

information is necessary for the firefighters to provide a safe and effective response in emergency situations.

105.    The MSDS provided with Defendants' Class B foams did not – and to this day do not – state that these foams contain PFAS or PFAS-containing materials; that PFAS is persistent, toxic and bio-accumulating; or that PFAS exposure causes serious bodily harm.  To the contrary, the MSDS falsely stated that the Class B foams and/or their contents were not known carcinogens and did not cause birth defects.

106.    Even now, the MSDS do not reflect the known serious health risks and hazards associated with exposure to PFAS in these Class B foams. For example, a MSDS updated on as recently as May 19, 2021by Defendant, National Foam, for AFFF stated the product was **not considered carcinogenic** - contrary to decades of science.

### (3)    Defendants' Misrepresentations About PFAS Continue to this Day

107.    Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts and Class B foams made with or containing PFAS.

108.    Defendants' misinformation campaign is long-standing and continues to this day. Some pertinent examples include:

>    a.    2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turn-out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile."  He acknowledged that turn-out gear is treated with PTFE to provide a

26

durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants.  "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn-out gear.  ***However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters.  There is absolutely no connection at all between PFOS and firefighter turnout gear.***" (Emphasis added).

b.    2018 – The National Fire Protection Association (which maintains committees on foams and turnouts that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnouts containing PFAS or PFAS containing materials.

c.    2019 – Defendant Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

d.    2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she ***absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure***." (emphasis added)

e.    2019 - The Fire Fighting Foam Council (of which many Defendants have been members since its inception in 2001) wrote in their newsletter that: "Short-chain (C6) fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."

f.    2019 – Defendant Dynax founder Eduard Kleiner stated that C6-based surfactants [short-chain PFAS] do not bioaccumulate.

27

FILED DATE: 8/2/2023 7:29 PM    2023L007714

g.    2019 – Defendant Gore issued a public statement, stating that "the potential exposures and associated risks of cancer effects from PFOA alternative and non-polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant."

h.    2020 - Fluoro Council – the lobbying arm of the PFAS industry – maintains that PFAS fluorotelomers that are in Class B foam and turnouts do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive systems, do not build up in the human body, and do not become concentrated in the bodies of living organisms.

i.    2020 - The Fire Fighting Foam Council website states: "The short-chain (C6) fluorosurfactants that have been the predominant fluorochemicals used in fluorotelomer-based AFFF for the last 25 years are low in toxicity and not considered to be bio-accumulative based on current regulatory criteria.

j.    2020 - The fire Fighting Foam Council's Best Practice Guidance for Use of Class B Foam - which was published in May 2016 and has not been updated to reflect the latest research - focuses entirely on eliminating and containing foam to minimize impact on the environment.  It makes no mention of how to minimize the impact on firefighters who routinely handle, prepare, spray, or use Class B foam during training or in firefighting.

k.    2020 – Defendant Lion-hired consultant Paul Chrostowski, PhD took out a full-page in Firefighter Nation to argue that turnout gear is completely safe and any evidence to the contrary, including the Notre Dame study, is unreliable and fear-mongering. "[E]ven if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population…. the connection between PFAS and cancer is extremely weak.  The few peer reviewed epidemiological studies that have found an association were not statistically significant and inconsistent with other studies…. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer

FILED DATE: 8/2/2023 7:29 PM     2023L007714

causing toxic chemicals present on the fireground, as well as metabolic heat stress…Alternative materials tried by the U.S. fire service thus far have proven to be unsafe.

l.      2020 – Defendant Lion through its hired consultant Chrostowski also stated in Firefighter Nation that all turnouts are compliant with the standards set by the NFPA and Swiss organization OEKO-TEX's Standard 100 for PPE and Materials for PPE. "The OEKO-TEX certification process tests for the presence of unsafe levels of trace materials, including PFOA.

m.      2021 - In a New York Times article, Defendant W.L. Gore maintained that its turnout products were safe.

n.      2021 - Defendant Lion stated that the representations articulated by its consultant Paul Chrostowski in 2020 (see above), reflect its position: "Dr. Chrostowski's report says it all for Lion."

o.      2021 - Defendants MSA Globe and W.L. Gore have continued to state that their products have been tested and are safe.

p.      2022 – Defendant 3M stated that it was not "necessary or appropriate" to declare any PFAS hazardous.  It also states on its website that: "The weight of scientific evidence from decades of research does not show that PFOS or PFOA causes harm in people at current or past levels….Decades of research into the health of these workers has not identified negative health outcomes caused by exposure to PFOA or PFOS….It is important to know that while some studies may find links or associations with possible health outcomes, this is not the same as causation. The weight of scientific evidence does not show that PFOS or PFOA causes harm to people at current or historical levels.  Although PFAS have been detected in the environment at extremely low levels, their mere presence does not mean they are harmful…. Although it has been widely reported that no causal connection has been identified between exposure to PFOS or PFOA and harm to people's health, there is a great deal of misinformation in the public domain…. The findings of the C-8 science panel are also frequently misunderstood.

29

FILED DATE: 8/2/2023 7:29 PM     2023L007714

q.    2022 - DuPont and Chemours also continue to assert that there is little scientific evidence to support that PFAS and/or certain PFAS, like fluoropolymers, are harmful to human health.

r.    2022 - DuPont maintains that turnouts keep firefighters safe and "protect against the intrusion of…chemicals."

109.    As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership has echoed these narratives.

110.    For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a statement that both mischaracterized and purported to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnouts and Class B foams was minimal to non-existent.   The statement even encouraged firefighters to continue to wear turnouts and use legacy Class B foams, creating a false sense that these PFAS-containing turnouts and foams were safe.

111.    The IAFF maintained the Defendants' position that the turnout gear and Class B foam was safe until new leadership took over in 2021.  Because of these and other false claims and misrepresentations on the part of Defendants, Plaintiff ERIC KLASS did not know and, in the exercise of reasonable diligence, could not have known that the turnouts and Class B foams he used contained PFAS or PFAS-containing materials, and caused ERIC KLASS to be exposed to PFAS and/or PFAS-containing materials, causing him to suffer prostate cancer as a result of such exposure.

30

FILED DATE: 8/2/2023 7:29 PM    2023L007714

**F.**    **New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts and Class B Foams - But Defendants Continue to Discount or Deny These Risks**

112.    While historical research (and follow-on litigation) has centered on environmental impacts and environmental exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to turnouts and Class B foams containing PFAS.

113.    In October 2019, for example, an expert panel of the International Pollutants Elimination Network (IPEN), an international non-profit organization comprised of over 600 public interest non-governmental organizations dedicated to improving global chemical waste policies, published a scientific paper that, in the words of its authors, "presents unequivocal evidence from recent studies that firefighters" using Class B foams (primarily AFFF) "have unexpectedly elevated blood levels" of PFAS, including, specifically, PFHxS and PFOS, with PFHxS (a short-chain, C6 PFAS) being "potentially of greater concern than PFOS given its much longer elimination half-life in humans."    The paper explains that "firefighters can be significantly exposed to PFHxS and other PFAS from firefighting foam via various occupational mechanisms including direct exposure during use as well as exposure from contaminated personal protective equipment (PPE), handling of contaminated equipment, managing PFAS foam wastes, occupation of contaminated fire stations and consumption of contaminated local water and produce. Cross-contamination and legacy PFAS residues from inadequately decontaminated appliances after transitioning to fluorine-free foam can remain a long-term problem."    The panel concluded that "[o]ngoing exposure

31

FILED DATE: 8/2/2023 7:29 PM   2023L007714

to PFHxS, PFOS and other PFAS amongst firefighters remains a major occupational health issue," noting that "[b]io-accumulation and very slow bioelimination may be very significant influencing factors in PFHxS exposure" in firefighters.

114.    In June 2020, scientists at the University of Notre Dame published a groundbreaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study").  The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell, over several production years.

115.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers."   According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of gear.  The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, NEtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin.

FILED DATE: 8/2/2023 7:29 PM    2023L007714

116.    These findings suggest that PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their apparatus and workplace with PFAS.  The analysis also indicated that fluoropolymers from the outer layer decompose into other PFAS, including PFOA

117.    The researchers also reported "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in the laboratory."   The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters that rely on turnouts to protect them from heat, fire, water and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage. Lead researcher Graham Peaslee commented that turnouts are "the most highly fluorinated textiles I've ever seen" and that the level of PFAS in the turnout gear means that firefighters are "swimming in a sea of [PFAS].

118.    Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."

FILED DATE: 8/2/2023 7:29 PM    2023L007714

119.    Defendant Lion's responses have been similar and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job.

120.    The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts.   It does not, however, address that Lion's turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health harms associated with exposure to these toxic, bio-accumulating chemicals.

121.    As noted above, Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has disparaged the Notre Dame Turnout Study and its findings. Addressing a *Fire Rescue* magazine article about the study, Chrostowski repeated Lion's website statement that "PFOA was never part of the gear itself and frequent independent testing has found only trace amounts of it in any of the gear - not nearly enough to cause concern, and in amounts similar to consumer products."   Chrostowski went on to say "the fact is that one may find trace amounts of "short-chain" PFAS such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous credible published scientific research papers.   Finally, Chrostowski falsely stated that the link between PFAS exposure and cancer is "extremely weak."

122.    Lion has admitted publicly that dermal absorption is a pathway of exposure to cancer-causing chemicals for firefighters.  In Lion's *Not in Our House* cancer awareness fact sheet that currently appears on the company's website, Lion warns firefighters:

"For every 5 degree increase in temperature, skin becomes 400% more absorbent. The hotter you are, the more carcinogens your skin absorbs."   This statistic is alarming given that the core body temperature of firefighters routinely increases during firefighting activities while wearing turnouts which contain known carcinogens.

123.    Likewise, Defendant Honeywell has stated: "The skin on the neck is very thin and prone to absorbing carcinogenic particulates."

124.    Another recent Harvard study examining PFAS levels in fire stations dust found that "dust in turnout gear locker areas and adjoining apparatus bays had significantly higher fluorine concentrations compared to living rooms in fire stations," as well as fluorine concentrations typically found in in Class B foam and/or textiles as opposed to consumer products.

125.    For years, the IAFF has held a yearly cancer summit and until 2021, had done little to address the PFAS in turnouts. Defendants, including at least DuPont, Gore, Lion and MSA/Globe, have been regular sponsors of the IAFF Cancer Summit.

126.    At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters is attributable either to other chemicals encountered in the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the turnout Defendants admitted that the PFAS materials in their products has

been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm.

### H.     It Was Technologically and Economically Feasible for Defendants to Design Safer Firefighting Foams and Turnouts

127.    Defendants have long known that safer, reasonable, alternative designs existed and could be utilized.  These designs are and were not only feasible technologically, but also economically.

128.    In the early 2000s, 3M, in conjunction with Solberg Scandinavian as developed Re-Healing Foam ("RF"), a high-performance, AFFF-comparable product that contained no fluorochemicals, and resulted in two patents and three commercial products of PFAS-free firefighting foam.  RF met the standard of "ICAO [International Civil Aviation Organization] Level B and matched AFFF in performance including a US MIL-Spec product."111 In 2007, Solberg bought 3M's patent rights to RF and continued to market and sell RF.  In 2011, Defendant Amerex acquired Solberg and continued to manufacture, market and sell RF. In 2014, the EPA presented Solberg with the Presidential Green Chemistry Challenge Award for its fluorine-free foams; the award recognizes technologies that prevent pollution and match or improve the performance of existing products. In 2018, Defendant Perimeter Solutions in 2018 acquired Solberg and continued to manufacture, market and sell RF.

129.    Beginning in the early 2000s, BIOEX launched a highly effective, fluorinefree Class B F3 foam which has been approved and used by international airports, fire departments, oil and gas companies, the marine industry and pharmaceutical and chemical companies around the world.

FILED DATE: 8/2/2023 7:29 PM  2023L007714

FILED DATE: 8/2/2023 7:29 PM    2023L007714

130.    However, lobbyists and companies invested in maintaining profits on fluorinated Class B foam not only continued to represent that PFAS-containing foam was safe, but also intentionally maligned the fluorine free foams, falsely asserting that these foams were less effective and more expensive.

131.    In 2011, the Fire Fighting Foam Coalition, which includes Defendants Tyco, DuPont, Dynax, Kidde, and Buckeye, misrepresented a U.S. Navy report comparing Solberg's fluorine-free RF with Defendant National Foam's 6-Em AFFF and Defendant Buckeye's FC-3MS AFFF, asserting Solberg's RF was less effective.  In fact, though Solberg's RF was not made per military specifications as it did not include fluorine, the U.S. Navy Report found the opposite.

132.    The technology to develop safer, effective and economical fluorine-free Class B foam is and has been available for at least over 20 years. In fact, many firefighting foam manufacturers and distributors manufacture, market and/or sell fluorine-free firefighting foams, including Defendants Tyco, Perimeter Solutions, Chemguard, Johnson Controls, and National Foam.

133.    Safe fluorine-free turnout gear was and is also technologically and economically feasible.

134.    Defendant Fire-Dex manufactures, markets and sells an entire line of PFAS-free turnouts, as well non-fluorinated fabrics from Safety Components with a PFAS-free water-repellent with no redaction for performance.

135.    Defendants MSA/Globe, Honeywell, Tencate, and Gore have developed, manufactured, marketed and/or sold PFAS-free waterproofing technology, PFAS-free outer shells in turnout gear and/or durable PFAS-free fabrics.

136.    Defendant Honeywell has admitted that these PFAS-free alternatives are safe, feasible and economical: "Any minor tradeoffs with PFAS-free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way. The color fastness and wear remain the same."

137.    While the technology to develop fluorine-free turnout gear has been available for years, the NFPA turnout standards-setting technical committee continues to adhere to certain guidelines for turnout gear which require PFAS – knowingly putting firefighters at risk for exposure to PFAS. This committee is comprised of industry consultants, textile and gear manufacturers, including Defendants MSA/Globe, Lion, Tyco, and Honeywell.

138.    The economic and technological feasibility of fluorine-free foams and turnout gear is well-established and based on technology that has been available for years. The alternative designs detailed above are far safer for firefighters and eliminate the serious health risks that result from PFAS exposure.

139.    The only barrier to producing safer alternatives to PFAS-containing foams and turnout gear has been Defendants' opposition. Their continued manufacturing, marketing, selling, promoting and/or distributing PFAS-containing foams and turnout gear has exposed firefighters to toxic PFAS chemicals. These defective designs have been a substantial factor in causing Plaintiff ERIC KLASS' cancer.

## COUNT I

FILED DATE: 8/2/2023 7:29 PM    2023L007714

FILED DATE: 8/2/2023 7:29 PM    2023L007714

**Negligence**

140.   Plaintiffs incorporate by reference paragraphs 1-139 of this Complaint as though fully set forth herein.

141.   Defendants owed a duty of care towards Plaintiffs ERIC KLASS and ELIZABETH KLASS that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally persistent, toxic, and bio-accumulative nature of Class B foam and turnouts containing PFAS or PFAS-containing materials.

142.   Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of Class B foam and/or turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or bodies of the firefighters, including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

143.   Defendants had a duty to exercise reasonable care to ensure that Class B foam and/or turnouts were manufactured, marketed, and sold in such a way as to ensure that the end users of Class B foam and/or turnouts were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

144.   Defendants had a duty to warn of the hazards associated with PFAS and PFAS containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the Class B foam and/or turnouts.

FILED DATE: 8/2/2023 7:29 PM    2023L007714

145.    At the time the Defendants' respective products left their control, they were in an unreasonably dangerous condition in that they contained PFAS and PFAS-containing chemicals which are hazardous to human health.

146.    On, before and after August 3, 2021, Defendants, individually, and through their respective agents, employees and representatives, were negligent in one or more of the following ways:

    a.    Designed, tested, manufactured, formulated, marketed, promoted, supplied, sold and/or distributed PFAS chemical and PFAS-containing products when they knew or should have known that exposure to these products was hazardous to human health;

    b.    Recommended application and/or disposal techniques for PFAS and/or PFAS-containing products that they knew or should have known would lead to exposure hazardous to human health;

    c.    Failed to warn of the presence of PFAS and/or PFAS-containing products;

    d.    Failed to warn of the health hazards of PFAS; and,

    e.    Underreported, underestimated and downplayed the human health hazards posed by PFAS and/or PFAS-containing products.

147.    As a proximate result of one or more of the foregoing negligent acts or omissions, Plaintiff, ERIC KLASS was exposed to significant levels of PFAS which caused or contributed to his prostate cancer diagnosed on August 3, 2021. Plaintiff, ERIC KLASS discovered a connection between these products and his cancer less than two years before the filing of this Complaint.

**COUNT II**

**Strict Liability**

148.    Plaintiffs incorporate by reference paragraphs 1-139 of this Complaint as though fully set forth herein.

149.    Defendants owed a duty of care towards Plaintiffs ERIC KLASS and ELIZABETH KLASS that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally persistent, toxic, and bio-accumulative nature of Class B foam and turnouts containing PFAS or PFAS-containing materials.

150.    Plaintiff ERIC KLASS used defendants' products as intended and instructed.

151.    Before August 2021, and before the Defendants' PFAS and/or PFAS-containing products left their control, they were unreasonably dangerous in one or more of the following ways:

   a.    They were designed and/or manufactured to contain chemicals hazardous to human health; and,

   b.    They were not accompanied by nor did they contain warnings relating to human health hazards caused by the chemicals they contained.

152.    As a proximate result of one or more of the foregoing unreasonably dangerous conditions, Plaintiff ERIC KLASS was exposed to significant levels of PFAS which caused or contributed to his prostate cancer diagnosed in 2021.  Plaintiff ERIC KLASS discovered a connection between these products and his cancer less than two years before the filing of this Complaint.

## COUNT III

## Breach of Implied Warranty of Merchantability

FILED DATE: 8/2/2023 7:29 PM    2023L007714

153.    Plaintiffs incorporate by reference paragraphs 1-139 of this Complaint as though fully set forth herein.

154.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of designing, manufacturing, distributing, supplying, and/or selling turnouts and/or Class B foam and, by doing so, impliedly warranted that the turnouts and/or Class B foams were merchantable, safe, and fit for ordinary purposes for which they were used, including for use by firefighters such as Plaintiff ERIC KLASS.

155.    Defendants knowingly placed PFAS and/or PFAS-containing turnouts and/or Class B foam into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold turnouts and/or Class B foam to fire departments for use by firefighters such as Plaintiff ERIC KLASS, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities, including training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

156.    Defendants intended that the PFAS and/or PFAS-containing turnouts and/or Class B foam they were manufacturing, distributing, supplying, and/or selling would be used by firefighters, including the Plaintiff ERIC KLASS, without any substantial change in the condition of the products from when the products were initially designed, manufactured, distributed, supplied, and/or sold by Defendants.

157.    Plaintiff ERIC KLASS used and/or was exposed to these PFAS-containing products in the ways that Defendants intended them to be used and for the ordinary purposes for which these products were intended.

FILED DATE: 8/2/2023 7:29 PM    2023L007714

158.    Plaintiff ERIC KLASS used and/or was exposed to these PFAS-containing products in ways that were foreseeable to Defendants.

159.    Plaintiff ERIC KLASS was exposed to PFAS by using Defendants' PFAS-containing turnouts and/or Class B foam in the course of his firefighting activities, as described above, without knowledge of the turnouts' and/or Class B foam's dangerous and hazardous properties.

160.    The turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by Defendants and used by Plaintiff ERIC KLASS, contained PFAS or PFAS- containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the turnouts and/or Class B foam are defective in design and/or are unreasonably dangerous, unsuitable, and not safe for use by firefighters even when used as directed by the manufacturer and for the intended purposes of firefighting activities which include training, extinguishment, ventilation, search-and rescue, salvage, containment, and overhaul.

161.    Further, knowing of the dangerous and hazardous properties of turnouts and Class B foam, Defendants could have designed, manufactured, distributed, supplied, and/or sold reasonable alternative designs or formulations of turnouts and/or Class B foam that did not contain PFAS.  Such alternative designs would have been safer for consumer-firefighters and would have reduced or prevented ERIC KLASS' harm. These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

162.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Plaintiff, ERIC KLASS that was caused by the Defendants'

design, manufacture, distribution, supply, and/or sale of PFAS and PFAS-containing materials, including turnouts and/or Class B foam.

163.     Additionally, the turnouts and/or Class B foam that were designed, manufactured, distributed, supplied, and/or sold by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, manufacturing, distributing, supplying, and selling these products was unreasonably dangerous under the circumstances.

164.     The PFAS-containing turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of PFAS-containing turnouts and/or Class B foam.

165.     The PFAS-containing turnouts and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, said products were unreasonably dangerous, unreasonably dangerous in normal use, did not meet ordinary consumer-firefighter's reasonable expectations as to their safety, and were more dangerous than an ordinary consumer-firefighter would expect.

166.     The PFAS-containing turnouts and/or Class B foam were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-

44

FILED DATE: 8/2/2023 7:29 PM    2023L007714

containing products were defective and unsafe, especially when used in the form and manner as provided by Defendants.  Defendants' PFAS-containing products were defective in the following ways:

167.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation and as a result failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect and failed to contain adequate or appropriate warnings.

168.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

169.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam were unreasonable dangers in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

170.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or Class B foam contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

171.    Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use.

172.    Defendants knew or should have known at the time of designing, manufacturing, distributing, supplying and/or selling their PFAS-containing turnouts and/or

FILED DATE: 8/2/2023 7:29 PM    2023L007714

Class B foam, that exposure to PFAS by firefighters, including the Firefighter Plaintiffs, could result in cancer and other grave and serious illnesses and injuries as alleged herein.

173.    The unreasonably dangerous design defect in turnouts and/or Class B foam containing PFAS exposed Plaintiff ERIC KLASS to toxic levels of PFAS and therefore, was a proximate cause of the Firefighter Plaintiffs' injuries and damages as described herein.

174.    As a result of Defendants' design and formulation of a defective product, Defendants are liable in damages to Plaintiff ERIC KLASS.

175.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff ERIC KLASS suffered the injuries and damages described herein.

176.    Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiff ERIC KLASS, as described herein, thereby entitling Plaintiff ERIC KLASS to an award of punitive damages.

## **COUNT IV**

**Loss of Consortium**

177.    This cause of action is asserted against all Defendants on behalf of the Spouse Plaintiff.

178.    Plaintiffs incorporate by reference paragraphs 1-139 of this Complaint, as though fully set forth herein.

179.    At all times relevant to this action, Plaintiff ELIZABETH KLASS and Firefighter Plaintiff ERIC KLASS were and are now lawfully married:

180.    As alleged above, and as a result of the conduct of the Defendants, Firefighter Plaintiff ERIC KLASS sustained severe and permanent injuries and damages.

FILED DATE: 8/2/2023 7:29 PM   2023L007714

181.    As a proximate result of her husband's injuries sustained from the exposure to and/or use of Class B foam and/or turnouts in the ordinary course of performing his firefighting duties, Plaintiff ELIZABETH KLASS was deprived of love, companionship, comfort, care, assistance, protection, affection, society, and other consortium elements, during her husband's illnesses, treatments and recoveries, which deprivation has caused, continues to cause, and in the future is expected to cause Plaintiff ELIZABETH KLASS emotional distress and other injuries.

WHEREFORE, Plaintiffs, ERIC KLASS and ELIZABETH KLASS, demand judgment against Defendants, 3M COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARCHROMA U.S., INC; ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT; CARRIER GLOBAL CORPORATION; CHEMGUARD, INC.; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & CO.; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; LION GROUP, INC.; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA, d/b/a SOUTHERN MILLS INC.; THE CHEMOURS COMPANY L.L.C.; TYCO FIRE PRODUCTS, L.P.; and W.L. GORE & ASSOCIATES, INC., and each of them, for a sum in excess of the jurisdictional minimum of the Law Division of the Circuit Court of Cook County.

FILED DATE: 8/2/2023 7:29 PM    2023L007714

## COUNT V
### Respondent in Discovery

Plaintiffs, ERIC KLASS and ELIZABETH KLASS, by and through their attorneys, CORBOY & DEMETRIO, P.C., and designated AIR ONE EQUIPMENT, INC., an Illinois corporation, who is believed to have information essential to the determination of who should be properly named as additional defendants in this action pursuant to 735 ILCS 5/402, as Respondent in Discovery.

Respectfully submitted,

Britney R. Pennycook

Kenneth T. Lumb
William T. Gibbs
Britney R. Pennycook
CORBOY & DEMETRIO, P.C.
Attorneys for Plaintiffs
33 N. Dearborn Street
Suite 2100
Chicago, Illinois 60602
(312) 346-3191
Firm I.D. #02329
ktl@corboydemetrio.com
wtg@corboydemetrio.com
brp@corboydemetrio.com

48

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

ERIC KLASS; and ELIZABETH KLASS,

        Plaintiffs,

        v.

3M COMPANY; AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION;
ARCHROMA U.S., INC; ARKEMA, INC.; BUCKEYE FIRE EQUIPMENT; CARRIER GLOBAL CORPORATION; CHEMGUARD, INC.; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS & CO.; FIRE-DEX, LLC; FIRE SERVICE PLUS, INC.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; LION GROUP, INC.; MINE SAFETY APPLIANCE COMPANY LLC; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; PERIMETER SOLUTIONS, LP; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; THE CHEMOURS COMPANY L.L.C.; TYCO FIRE PRODUCTS, L.P.; and W.L. GORE & ASSOCIATES, INC.,

        Defendants and,

AIR ONE EQUIPMENT, INC., an Illinois corporation,

        Respondent in Discovery.

No.    2023L007714

**A F F I D A V I T**

I, BRITNEY R. PENNYCOOK, state under oath:

1.    I am an attorney associated with Corboy & Demetrio, P.C. and am responsible for filing of the Complaint at Law in this matter.

2.    The total of money damages sought by plaintiff does exceed $50,000.00, exclusive of interest and costs.

                  CORBOY & DEMETRIO, P.C.
                  By: Britney R. Pennycook

SUBSCRIBED and SWORN to before me this
___ day of _August_____, 20 _23_.

_____
           NOTARY PUBLIC

"OFFICIAL SEAL"
MARY M. LUNDIN
Notary Public, State of Illinois
My Commission Expires 06-29-2025

Britney R. Pennycook
CORBOY & DEMETRIO, P.C.
Attorneys for Plaintiff
33 North Dearborn Street, 21st Floor
Chicago, Illinois 60602
(312) 346-3191
Firm I.D. No. 02329
Primary E-Mail: ccfiling@corboydemetrio.com

FILED DATE: 8/2/2023 7:29 PM   2023L007714